THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVEN MILLER *et al.*, Defendants-Appellants.

(No. 12064;

Fourth District—May 2, 1974.

Paul Bradley, Deputy Defender, of Chicago (Robert E. Davison, Assistant Appellate Defender, of counsel), for appellants.

C. Joseph Cavanagh, State's Attorney, of Springfield (James W. Jerz, of Model District State's Attorneys Office, of counsel), for the People.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

The defendants were found guilty by a jury of burglary and theft of property valued in excess of $150. Judgment was entered on both verdicts. The defendants were sentenced to an indeterminate term of 2 to 4 years for burglary and 1 to 3 years for theft, both sentences running concurrently. The defendants appeal.

Several issues are presented for review. However, we need only discuss those issues which are dispositive. Defendants submit the trial court failed to suppress evidence that was the fruit of an unlawful search and seizure. The State contends defendants lack standing to contest the validity of the search and seizure. We find defendants had standing and the trial court erroneously failed to exclude the contested evidence.

This issue arises out of a warrantless search of a rented locker located in the Greyhound Bus Station, Springfield, Illinois. Deputy Workman of the Sangamon County sheriff's department received a phone call on March 24, 1972, from an unidentified informant who implicated the de-

fendants in a burglary that occurred on March 23, 1972. The substance of the phone conversation was that certain stolen articles could be found in a locker located at the Greyhound Bus Station in Springfield. Workman believed that the unnamed informant was one Ray Action whom he characterized as an unreliable individual. Under the test of *Aguilar v. Texas*, 378 U.S. 108, 12 L.Ed.2d 723, 84 S.Ct. 1509, and *Spinelli v. United States*, 393 U.S. 410, 21 L.Ed.2d 637, 89 S.Ct. 584, because of his characterization Workman could not have obtained the search warrant based upon the information acquired from the informant.

Workman checked the Springfield city police reports and determined that a burglary had taken place on March 23, 1972, at the residence of Otto Stolleis. He then proceeded to the bus station and contacted Mr. Edward Allen, the assistant manager of the bus depot. Workman asked Allen if he had any way that the contents of the lockers could be checked. At this time, Workman did not have a search warrant. Allen got a master key and proceeded to open the locked lockers in order to gain access to the contents thereof. According to Workman, Allen opened approximately 25 to 30 lockers before they found the locker that contained the items taken from the Stolleis residence. Mr. Allen stated that he only opened four or five lockers before they found the locker that the authorities were interested in. None of the items found in the locker were seized or removed by either Mr. Allen or Deputy Workman. Immediately thereafter, surveillance of the locker was commenced.

Deputy Sheriff Dan Hoffman was on surveillance duty in the Greyhound Bus Station around 6 P.M. on March 24, 1972, when he observed the defendants approach the locker. One of the defendants put a key in the locker, opened it and removed a transistor radio. Hoffman approached the two individuals and informed them they were under arrest. The defendants began to resist Hoffman but they were subdued. Shortly after the apprehension of defendants, Hoffman returned with another deputy to secure the remainder of the contents of the locker.

The defendants were subsequently indicted for burglary and theft of property valued in excess of $150.

The defendants filed a motion to quash their arrest and suppress the evidence secured as a result of the search and seizure in question. On August 14, 1972, hearing was held on the motion to suppress. At the hearing on the motion, certain facts in addition to those above mentioned were brought out and are as follows. Defendant McGuire testified that the key he used to open the locker was given to him by Ray Acton, and that the key was given to him approximately ½-hour before he and Miller went to the bus station. McGuire stated that he and Miller went to the locker only as a favor to Acton.

Mr. Allen testified that the locker the merchandise was found in was locked, thereby indicating that it had been leased to someone. Allen stated that any individual can rent a locker for 24 hours by paying 25 cents. The only written agreement that exists between the lessee and lessor of the locker is contained on a sticker which is placed on the face of the locker. The sticker tells a potential lessee how to use the locker and if items put therein remain for over 24 hours there will be a storage charge. If it is determined that an individual has left items in the locker over 24 hours, an agent of the lessor will remove the lock cylinder from the locker door and put a red tag thereon which states: "See Agent", at which time the lessee would pay their storage fee.

Allen stated that the locker in question had not been used for more than 24 hours and therefore not subject to a storage charge.

On cross-examination by the State's Attorney, Mr. Allen testified that the bus terminal reserves the right to enter the lockers under certain circumstances even when they are leased to someone. The relevant portion of his testimony on this matter is as follows:

"MR. LANTER: Q. So then it's a policy, you represent the bus lines or the person—.

A. Union Bus Terminal.

Q. I see.

And, upon these—renting these lockers out, do you as manager reserve the right to look into the lockers?

A. Yes, sir.

MR. CASPER: Objections, your Honor. I think that calls for a conclusion. If he can testify as to what terms they are rented on that's fine. As to whether or not he has a right to enter those lockers is a legal conclusion which I don't this gentleman can testify to [sic].

THE COURT: Mr. Lanter?

MR. LANTER: Your Honor, as to when a person rents his property out to someone else, I think that as owner of the property or in this instance representative of the owner, they can reserve certain rights to that property.

MR. CASPER: This is true, your Honor. I will grant that and now if he can testify as to what the terms are, whether it is oral or written, that's fine, but as to whether or not if one of the terms would be—stated that on the face of the locker if that term is stated on the face of the locker that they reserve the right to enter, that's another question.

THE COURT: I think that's for the court to determine. I'll per-

mit you to ask the question and on cross examination if it's not proper I will not consider it.

MR. LANTER: Thank you, your Honor.

Q. As the manager and representative of the owner of the locker, do you reserve the right to enter those lockers?

A. Yes, sir.

Q. Even though it may be during the twenty-four hour period?

A. Yes, sir.

Q. And, what is the reason for that?

A. Well, about four years ago in Chicago, Illinois the locker companies used to have a plug that you would put in the keyhole, you wouldn't open the locker, you just put it in the keyhole and nobody could use it, and they found a baby that had been stored for about a week and they decided that that wasn't too good a procedure, so every day when I open the lockers or if we have an odor at that end I'll go up and open lockers and either push something or if there is a suitcase I'll push the sides and on occasion I have found merchandise in there that shouldn't have been. We found some sausage that was about a week old, thought we had a ringer there."

On redirect examination by Mr. Casper, defendant's counsel, the following was elicited:

"Q. In relation to your testimony concerning a reservation of your right to go into the lockers, this is understandable. Now, as you testified earlier pertaining to a certain placard or some written stuff on the face of the lockers—.

A. Yes, sir.

Q. —is there anything stated on that writing on the face of the lockers wherein you indicate that you reserve the right to gain entrance to those lockers?

A. I don't remember the exact wording, but I know it puts them to it there that if it's not picked up in so many days it would be destroyed, so we would have to get into the lockers.

MR. CASPER: You have answered the question. Thank you."

The defendants' motion to quash arrest and suppress the evidence was denied by the court. In issuing its order, the trial court failed to make findings of facts and conclusions of law as required by section 114—12 (2)(3) of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 114—12(c). The statute states:

"The order or judgment granting or denying the motion shall

state the findings of facts and conclusions of law upon which the order or judgment is based."

On August 16, 1972, a jury trial was commenced. Deputy Workman and Deputy Hoffman reiterated their testimony that was given at the hearing on the motion to suppress. Mr. Otto Stolleis testified for the State that his home had been broken into at around 3 P.M. on March 23, 1972. Mr. Allen also testified. His testimony was substantially the same as he gave at the pretrial motion hearing.

The defendants called several alibi witnesses to testify in their behalf. Defendant McGuire took the stand and attempted to corroborate the alibi testimony. On August 17, 1972, the jury found defendants guilty of both charges. Defendants filed a motion for a new trial on September 5, 1972, which was denied. Defendants filed their notice of appeal in this cause on September 11, 1972.

The defendants submit that the warrantless search and seizure of items found in the rented locker was unlawful and the fruit of the search should have been suppressed. Consequently, defendants' conviction should be reversed and the cause remanded for a new trial. The State argues that notwithstanding any legal constitutional infirmities attending the search and seizure, defendants lack standing to urge suppression of the evidence in question. The State cites *People v. McNeil,* 53 Ill.2d 187, 290 N.E.2d 602, and *People v. Pohlmann,* 13 Ill.App.3d 779, 300 N.E.2d 302.

■■ With regard to the issue of standing, we are mindful that in *Pohlmann* we held that defendant lacked standing to urge suppression of certain evidence because the facts of the case clearly revealed that he could not have had a reasonable expectation of privacy in the trunk of the car searched. We noted in *Pohlmann* that the court in *McNeil,* when discussing the parameter of the defendant's standing to suppress evidence, stated standing to suppress evidence unlawfully secured "exists only when one can show that his constitutional rights were violated by the search and seizure, and 'not by those who are aggrieved solely by the introduction of damaging evidence.'" 13 Ill.App.3d 779, 781—2.

The State argues that defendants' defense throughout the case was that the key to the locker was given to defendants by Ray Acton. The State surmises that defendants' theory of the case is that Acton would be the lessee of the locker and that defendants had no interest in the locker whatsoever. Therefore, since defendants had no interest in the locker, they lack standing.

■■ In *Pohlmann,* we stated that questions of consent, agency and property interest were secondary to the ultimate issue of whether an individual had a reasonable expectation of privacy. The State would

have us reverse our previous position and subscribe to a rule that is totally contrary to the above statement. A proprietary interest in a place searched is not a dispositive factor in and of itself but rather one of constituents that must be considered in examining the facts upon which defendants' reasonable expectation of privacy is predicated. (*People v. Nunn*, 55 Ill.2d 344, 304 N.E.2d 81.) It is clear from the record that defendants were in lawful possession of the key to the locker that was searched. Also, notwithstanding the fact defendants did not allege a possessory interest in the locker, they clearly allege that they had a right to access to the locker; thus defendants would then have had a reasonable expectation of privacy during the period of time which they had possession of the key to the locker.

■■ The facts of this case are clearly distinguishable from the ones found in *Pohlmann*. The defendant in *Pohlmann* did not have any right of access to the automobile trunk that was searched by the authorities. The automobile was located in a community over 100 miles from the defendant's residence. The contraband was placed in the trunk of an automobile owned by someone other than defendant. The question of who had a proprietary interest in the automobile was relevant to show that individuals other than defendant could have gained access to the trunk thereof, thus vitiating defendant's purported reasonable expectation to privacy therein. In this case, the facts are totally dissimilar. Defendants lived in the same community wherein the locker was located; they had in their possession the only key that could gain admittance to the locker other than the two keys the bus station authorities retained. We find that during that period of time which defendants had exclusive possession of the key to the locker, they had a reasonable expectation of privacy, and therefore had standing to urge suppression of the evidence.

Defendants contend that when an individual rents a locker, closes the door, and locks it, there is a reasonable expectation that the items placed therein would remain private. Defendants submit that according to the instruction on the locker door the lessee was entitled to occupy the locker for 24 hours upon payment of twenty-five cents; and that the locker in which the alleged contraband was found had not been in use for more than 24 hours. Defendant cites *Chapman v. United States*, 365 U.S. 610, 5 L.Ed.2d 828, 81 S.Ct. 776, and *Stoner v. California*, 376 U.S. 483, 11 L.Ed.2d 856, 84 S.Ct. 889, for the proposition that neither a landlord or a hotel clerk may validly consent to the search of a rented area.

Essentially, the issue herein is: did the rental agent have the authority to consent to the search of the locker; that is, did the agent have equal

rights of possession with defendants in the locker so as to vitiate defenants' reasonable expectation of privacy therein?

■■■ In *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L.Ed.2d 564, 91 S.Ct. 2022, when the court was discussing warrantless search and seizures, it stated:

> "* * * 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be a 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.'" (403 U.S. 443, 454, 29 L.Ed.2d 564, 576.)

Generally a search of a protected area requires the issuance of a search warrant in order to become reasonable. When the authorities act without a warrant, the burden is upon them to demonstrate that their conduct was justified. They must demonstrate that their warrantless search and seizure came within one of the "well-delineated exceptions" such as a search incident to a valid arrest or consent given by a suspect or by a third party with the authority to consent.

■■ In Illinois, the rule is that an equal or greater right to the use or occupancy of property gives the holder of these rights the authority to consent to a search of the property and that evidence found as a consequence of such search is admissible against a non-consenting co-occupant. (*People v. Nunn.*) The rule is not based upon a theory of waiver, but rather the co-occupant's equal rights in the property which permits that individual to consent to a search. An individual who possesses common authority over the premises or effects sought to be inspected, that individual can consent to the search notwithstanding the defendant's interest therein. *United States v. Matlock*, —— U.S. ——, 39 L.Ed.2d 242, 94 S.Ct. 988.

Since *Katz v. United States*, 389 U.S. 347, 19 L.Ed.2d 576, 88 S.Ct. 507, when dealing with fourth amendment issues, the critical question has been: What was defendant's reasonable expectation of privacy? In a situation of co-use or co-occupancy, both parties' expectation of privacy is reciprocal. A co-user's right of privacy in a place or thing used in common is constantly subject to intervention by the third party's co-equal rights. This would include the third party's consent to a police search of the item shared in common. *Frazier v Cupp*, 394 U.S. 731, 22 L.Ed.2d 684, 89 S.Ct. 1420.

In *Frazier*, the Supreme Court found that defendant did not have a

valid search and seizure claim with regard to clothing seized by authorities upon the search of his duffle bag. The record established that defendant's cousin was a joint user of the bag and that he gave the authorities permission to search the duffle bag. The Court found that as a joint user, he had the authority to consent to a search upon his arrest and the evidence found by the officers against defendant in the course of the lawful search was admissible against him.

In *Chapman v. United States,* Georgia law enforcement agents with the consent of defendant's landlord gained access to defendant's leasehold through an unlocked window. As a result of this entrance, the authorities seized an unregistered distillery and several gallons of mash. Defendant attempted to suppress the fruit of the alleged unconstitutional search but his motion was denied. On appeal, the Supreme Court reversed. The Court found that the landlord and the authorities forced open the window in order to gain access to the premises; that their purpose in entering was not to view waste—the only reason the landlord could legitimately gain access to the demised premises—but to engage in a search for distilling equipment; and that to uphold such an intrusion without a warrant would nullify the fourth amendment and leave lessee's "home secure only in the discretion" of a landlord. (365 U.S. 610, 616, 5 L.Ed.2d. 828, 833.) The Supreme Court pointed out that the landlord's right to enter was limited and not all encompassing, as would be the rights of a co-equal user of the property.

In *Stoner v. California,* defendant's hotel room was searched without a warrant but with the consent of the hotel clerk, who provided the authorities with the key. On appeal, the Supreme Court unanimously held that the search was unlawful and that the hotel clerk did not have authority to consent to such a search. The Court stated:

> "Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'"

(376 U.S. 483, 448, 11 L.Ed.2d 856, 860.)

The Court observed that when an individual rents a motel room, he extends implied or perhaps express permission to certain individuals—such as maids, janitors, repairmen, and the like—to enter his room and perform their particular duties. However, the permission to enter is limited by expressed terms or through custom and usage, the scope of which is clearly understood. The Court cited *Chapman* and reiterated the rationale applied therein that the lessor's actual authority to enter which was drawn upon by the authorities could not be expanded to include rights which the lessor himself did not have.

The consent search is constitutional only when the consenting party

has rights of possession and control of the premises or items shared jointly at least equal to those of defendant; for in such an instance the third person has an interest sufficient to constrain and render unreasonable defendant's expectation that the third party will not consent to an intervention by authorities of defendant's privacy. To put it more succinctly, where two persons have equal rights to the use or occupancy of premises or items, either may consent to a search. (*People v. Marino*, 5 Ill.App.3d 778, 284 N.E.2d 54). See *State v. Fassler*, 108 Ariz. 586, 503 P.2d 807, wherein the court upheld a consent search by a common carrier of defendant's trunk on the grounds that the carrier had a statutory right to inspect items in its possession when it believed the items contained contraband. The defendant's expectation of privacy was rendered unreasonable by the third-party statutory right to inspect items in its possession. Also, see *People v. Overton*, 24 N.Y.2d 522, 301 N.Y.S.2d 479, 249 N.E.2d 366, where the court of appeals of New York upheld the warrantless consent search of a student's locker by authorities—on the grounds that the consent given the authorities by the vice principal of the school, that defendant attended, was a valid consent in that the board of education through the vice principal retained dominion over the use of the locker and in turn had rights in the locker equal to that of defendant, thus enabling it to consent to a search without a warrant. The power of the vice principal to consent to the search flows from the affirmative obligation of school authorities to supervise the children entrusted to their care.

As noted before, in *United States v. Matlock*, the constitutionality of a consensual search of defendant's bedroom and closet was upheld. The authorities in that case received the consent to search the premises from defendant's paramour who jointly occupied, with defendant, the area searched. In the course of the search the officers found money that had been taken from a federally insured bank that defendant purportedly robbed. The Supreme Court reviewed the guidelines set down by the district court which were used to determine the validity or invalidity of the consent given to the law enforcement officials prior to their search. The two-prong test is as follows: the government must (1) prove that it reasonably appeared to the searching officer prior to the search that facts existed which will render the consentor's consent binding on the defendant; and (2) that prior to the search facts "do exist" which render the consentor's consent binding on the defendant. In the case at bar, the record reveals that the State failed to establish the latter element.

At the hearing on the motion to suppress, Mr. Allen, the agent for the lessor, testified that the sticker on the face of the locker constituted the only form of agreement between the lessor and the lessee of the locker.

The sticker apprised the lessee of how to use the locker and that a storage charge would be levied against the lessee for items left in the locker for over 24 hours. Allen stated that his right to open the lockers —under company policy—was limited to instances when the property remained in the lockers over 24 hours or noxious odors were emitted from the locker. His right to open the locker was clearly limited. Mr. Allen's testimony points out that his right of access to the locker was not co-equal with defendants. Thus, there is no evidence that renders the defendants' expectation of privacy unreasonable.

■■ The record establishes that the defendants were in lawful possession of the key to the locker in question. The items that were in the locker had not been there for a period greater than 24 hours. Therefore, it is clear that defendants had a reasonable expectation of privacy invested in the locker which could not be vitiated through the consent given the authorities by Mr. Allen. (See Annot: Search and Seizure— Consent, 31 A.L.R.2d 1078, and the Later Case Service Supplement thereto.) In light of the rationale found in the *Chapman* and *Stoner* cases, as well as *Frazier*, we find that the search and seizure involved in this case violated the defendants' fourth amendment rights.

Accordingly, the order of the circuit court of Sangamon County denying defendants' motion to suppress the evidence in question was erroneous. The judgment is reversed and this cause is remanded for a new trial.

Reversed and remanded.

SMITH, P. J., and TRAPP, J., concur.